FRED OSBORNE, Appellant, v. SAMUEL OSBORNE, and CATHERINE OSBORNE, Appellees.

**Wills:** COMPETENCY OF TESTATOR. On the question of competency to make a will or a subsequent revocation, the evidence is reviewed and held to show incompetency.

*Appeal from Poweshiek District Court.*— HON. A. R. DEWEY, Judge.

FRIDAY, OCTOBER 21, 1904.

SUIT in equity to set aside a deed made by Elizabeth Osborn to defendant Samuel, her son, on or about September 28, 1896, and to quiet plaintiff's title to two hundred and seventy-six acres of land. Defendants pleaded title in themselves, and in a cross-petition asked that their title be quieted, and that they be given possession of the property. The trial court dismissed plaintiff's petition, and gave to defendants the relief they demanded. Plaintiff appeals.— *Reversed.*

*W. R. Lewis* and *P. G. Norris,* for appellant.

*J. P. Lyman* and *Will C. Rayburn,* for appellees.

DEEMER, C. J.— Plaintiff claims that he is the bene-ficial owner of the land in controversy, having furnished the consideration therefor, although the title was originally taken in the name of his mother, Elizabeth; that his mother, in consideration of work performed and services rendered, agreed that the land should become his at her death; that his mother, pursuant to this agreement, made a will devising him the lands, which the defendant Samuel Osborn, his brother, destroyed; that his mother is now dead, and that he is entitled to be decreed the owner of said property, and to have title thereto quieted in him. · Defendants claim title under a deed made to them by Elizabeth Osborn, under date of September 28, 1896, and ask that their title there-under be quieted as against any claims of plaintiff, and that they be placed in the possession of the property. Plaintiff responds by saying that this deed was wholly without con-sideration and void, in that he has at all times been the beneficial owner of the property, his mother having no in-terest therein, save the naked legal title; that at the time the deed to Samuel was made Elizabeth was of unsound mind, and incapable, in fact and in law, of making a deed; that it was procured by undue influence practiced upon the mother by the defendant Samuel Osborn. The trial court upon these issues found for the defendant, and this appeal followed.

It is apparent from this statement of the case that de-fendants hold the paper or record title to the property, and that in order for plaintiff to recover he must establish by the preponderance of the evidence one or more of the claims made by him. Plaintiff and defendant Samuel Osborn are brothers, but they have never gotten along amicably, and this controversy, like many others, is an unfortunate one, yet one likely to happen whenever a mother first leaves a large estate by will to one son, and afterward deeds the same property to another.

Plaintiff has practically abandoned his claim to ·the

beneficial ownership of the land by reason of having furnished the entire consideration therefor; and well he may, for there is not sufficient evidence to sustain it. Nor is there enough in the record to support the claim that the mother, in consideration of plaintiff's labor and services, agreed to will him the land. In the year 1894 the mother did make a will whereby she devised the land in dispute to the plaintiff; but the deed under which defendants claim is subsequent thereto, and had the effect of defeating the will, even if that instrument had not been destroyed. So that plaintiff in order to recover must show that the mother was incapable of making the deed, or that it was procured from her by undue influence. This shown, plaintiff would take all under the will, if that be established, or one-half, in the event the will be held invalid for any reason.

A careful consideration of the entire record leads us to the conclusion that at the time of the making of both will and deed Elizabeth Osborn was mentally incompetent to make either. She was old and decrepit; had just before the making of the will had an apoplectic attack of more or less severity. After that her memory failed; she mumbled much to herself; became very untidy in her personal appearance; allowed all sorts of filth to accumulate in and around her house; gathered up dead and decaying animal flesh; used the heating stove for cooking purposes; stuck the ends of long pieces of wood in the fire, and as they burned off crowded the main stick further into the stove; gathered up dirty corn cobs, and strewed them over the floor of her dwelling. So filthy did the place become that hired men could not be induced to eat at her table. Even those who were there for but a few days at a time could not be induced to eat more than two meals; they preferred cold lunches from home. She spit in the skillet before cooking; kept the table in a filthy condition; allowed the milk to accumulate in the house, and to become sour and fetid. Before her apoplectic attack she had been a neat and tidy

housekeeper, but after that she grew worse and worse, lost all sense of pride of personal appearance, and allowed her house to become a storehouse of filth and foul odors. This was not due to the condition of her bodily health — at least she made no such excuses — but, on the contrary, to a general breaking down of the mental system. She became very forgetful; talked in a disconnected and rambling manner; forgot the names of her best friends; lost all interest in her business affairs; and, to our minds, became practically a mental wreck.

The attorney who drew the will stated at the time that he did not believe the woman was competent to execute it, and the one who prepared the deed would not do so until he had called in a physician to examine her. This physician gave an opinion that she was competent, but he saw her for not more than fifteen minutes, and was not correctly informed as to the woman's previous ailments. He was not told that she had had a paralytic stroke, either because of the woman's forgetfulness or because of a desire to keep the truth from him. He was not told of her idiosyncracies or peculiarities, nor of her true personal history. From a random conversation, not knowing the truth of any of her statements, he gave an opinion that she was of sound mind, and the deed was thereupon drawn.

Before the deed was executed the defendant Samuel, with his mother, went to the attorney who drew the will, and defendant asked that the will be returned. The conduct of the mother on this occasion was peculiar, to say the least. It seems that the mother had promised plaintiff after the making of the will that she would not make another; and this, it seems, she remembered, but, to get around her promise, it was suggested that she might keep faith by making a deed instead of a will. This she did, and then denied having done anything with reference to her property when plaintiff spoke to her about it. The conduct of all the parties indicates that from the time of the mother's apoplec-

tic stroke there was always a doubt regarding her soundness of mind, even by those who were not well acquainted with her. The attorney who drew the deed had strong suspicions of it, and first called in a physician before attempting to have her execute any papers. This, in itself, is a suspicious circumstance. The examination of the physician was cursory and incomplete, and he was not informed as to the true facts regarding her prior condition of health. Aside from those directly interested, those best acquainted with her in a business and social way testified that in their judgment she was incompetent to do business.

We are disposed to think that each of the sons sought to take advantage of the mother's condition of mind for his own enrichment, and that she did not have enough mental capacity to understand the nature and character of her acts. The mother lived with plaintiff until his (plaintiff's) marriage, and was more attached to him than to the defendant. She would undoubtedly have continued to live with him, but for the fact that at the age of fifty-two he concluded it was time to take unto himself a wife. As usual, this wife did not get along well with the feeble, decrepit, and childish mother. The mother then went to defendant's house, where she stayed from April to December of the year 1901, in which latter month she died. Living with plaintiff from the time of the making of the deed down until the year 1901, she always denied to him having made a new deed or will, although he knew to the contrary; but the attorneys for defendant Samuel were frequently writing to plaintiff, ostensibly on behalf of the mother, asking him to pay rent for the land. Although living in the same house with him, and sharing his hospitality, she never, during the more than four years that she lived with him after the execution of the deed, asked for any rent. Indeed, it is strange that rent should be demanded in her name, if the deed to the defendant Samuel was of any validity. By that instrument she had conveyed the property to Samuel, and he, and not

she, if any one, was entitled to the rent. Without going more fully into the facts — and we have set forth but few of the more salient ones — it is sufficient to say that we do not think Mrs. Osborn was mentally competent to make either the will or the deed.

This being true, she died intestate, and plaintiff and defendant Samuel Osborn, as her sole and only heirs, are each entitled to one-half of her estate. They should each have a decree quieting title to an undivided one-half of the real estate in controversy; and, under a stipulation which has been introduced in evidence, defendants should have judgment against plaintiff for the sum of $450, with six per cent. interest from March 1, 1903, for the use of one-half of the land. The rights of the respective parties for the year ending March 1, 1904, and for the time subsequent thereto, cannot now be determined, for we have no data from which to arrive at a correct conclusion. When the case reaches the lower court on *procedendo* this matter may be fully adjudicated and settled on the basis of this opinion.

The decree of the District Court must be reversed, and the cause remanded for one in harmony with this opinion. Each party will pay one-half of the costs of this appeal.— *Reversed.*